SENNA THOMPSON, APPELLANT, V. CATHRINE M. JOST ET AL.,
APPELLEES.

FILED JUNE 12, 1922. No. 22041.

1. **Sales: RESCISSION.** Evidence examined, and *held* that, fraud hav-
ing been established and plaintiff being guilty of no laches, is en-
titled to a rescission of the contract and the return of the pur-
chase money paid thereunder.

2. ———: CONTRACT. The general rule is that, in the absence of
anything to indicate a contrary intention, instruments executed
at the same time, by the same parties, for the same purpose, and
in course of the same transaction, are, in the eye of the law, one
instrument, and will be read and construed together as if they were
as much one in form as they are in substance.

APPEAL from the district court for Lancaster county:
WILLIAM M. MORNING, JUDGE. *Reversed, with directions.*

*T. F. A. Williams, E. B. Chappell* and *Homer L. Kyle,*
for appellant.

*Wilmer B. Comstock, contra.*

Heard before MORRISSEY, C. J., ROSE, ALDRICH and
FLANSBURG, JJ., DICKSON and STAUFFER, District Judges.

STAUFFER, District Judge.

Action in equity by Senna Thompson against Cathrine
M. Jost and George A. Jost for rescission of transaction
in which the plaintiff leased certain real estate and pur-
chased certain furniture from defendants. Plaintiff asked
for the cancelation and annulling of the lease and bill of
sale given in pursuance of said transaction and for the re
covery of $1,264.30 paid by her to defendants under said
contract. The district court found for the defendants and
against the plaintiff on all the issues, and ordered that the
plaintiff take nothing by her writ and that the defendants
go hence without day. The plaintiff thereupon filed mo-
tion for a new trial, which the court overruled.

Defendants are wife and husband. They inserted the

following advertisement in the March 28, 1920, issue of the Lincoln Daily Star. "For sale or rent—sixteen-room house suitable for hospital, rooming-house, sorority or frat house; two baths, sleeping porch, hot water heat, garage; also furniture for sale. Address 1725 Q. B1959. Mrs. G. Jost."

The plaintiff, who had experience in conducting rooming houses in Lincoln, saw the above advertisement. She called at the home of the defendants and made a casual examination of the premises and the personal property therein offered for sale by the defendants. A period of negotiations ensued, which finally culminated in the leasing of the premises by the plaintiff and the purchase of certain of the rooming-house equipment by the plaintiff under a bill of sale. Defendants then began to pack up. They were getting ready to move to Omaha. By mutual agreement they remained in the premises until April 15, 1920. During the delay in their removal the plaintiff visited the premises on several occasions and perhaps made the beds in a few rooms. Plaintiff moved in as the defendants were moving out.

April 15 was a day of discoveries for the plaintiff. The rooms were not equipped as defendants had assured plaintiff they were. The mattresses were inferior. Some beds had dirty ticks on them. The curtains were full of holes and the rugs were worn and dusty. The comforts were ragged and faded. The blankets were thin and worn and showed that they had been washed many times. In one room the mattress had been removed and an old torn tick put in its place. In room No. 1 the mattresses and curtains had been changed and old ones substituted. In one room an old pair of springs broken down in the center had been put into the bed and a dirty pillow stuffed into the hole to make it smooth. The carpets were worn and full of holes which had been covered up by throw rugs. They were moth eaten in places. Part of the draperies had been removed and those remaining were old and full of holes.

These discoveries caused plaintiff to telegraph the defendants at Omaha rescinding the entire transaction. She later wrote the defendants that she had rescinded the contract and that the personal property was in the premises at their risk. Thereupon the defendants took possession of the personal property and rented the house to one Mrs. Fitzgerald. Mrs. Fitzgerald insisted on an inventory being made of the rooming-house furnishings prior to her taking possession of them. This inventory was prepared by two of the roomers and is identified as exhibit 22. We will have occasion to refer to this inventory later.

Plaintiff claims that the furnishings left in the house by the defendants were not the furnishings that she purchased from the defendants on April 2, 1920. She claims that the defendants removed from the rooming-house the greater part of the furniture, fixtures, carpets, rugs, curtains, draperies, mattresses, quilts, ticks, and other bedding, bed-springs, towels, rocking chairs, and other furniture, leather settee cover, and other articles purchased of them by the plaintiff and passing to the plaintiff under the purchase, and had shipped them to Omaha, and substituted therefor other articles that were old and worn-out, shabby, dirty, unsanitary, useless, and of far less value than the articles purchased of defendants by the plaintiff.

We have read the record with painstaking care and can arrive at no other conclusion than that the defendants did not deliver to the plaintiff the precise rooming-house equipment that she purchased from them. We believe that other articles were substituted for the ones purchased by the plaintiff.

We have here a plaintiff who was experienced in the operation of rooming-houses. On her first visit to the home of the defendants she made a casual examination of the bed and bedding in room No. 1. Mrs. Jost told her that the blankets throughout all of the rooms were new, had never been washed, and had cost $6 a pair. She was further informed that the bedding, carpets and draperies in all of the

other bedrooms were equally as good as the equipment in room No. 1. Plaintiff relied on the assurance of the defendants in this respect and was thereby prevented from making a more extensive examination of the bedding, carpets and draperies in the other rooms.

It can hardly be said that she did not know what she was bargaining for. We are reinforced in our belief that the property was "switched" on account of the notations made on exhibit 22, the invoice heretofore referred to as having been prepared by two of the roomers for Mrs. Fitzgerald when she first moved in the premises. The notations on this exhibit are very illuminating as regards the condition of the property in the various rooms. The furniture in room No. 1 was referred to as "second-hand and badly worn;" that in No. 2 as "more or less damaged;" that in No. 3, No. 5, and No. 6 as "all more or less worn;" that in No. 4 as "all more or less bad order." With reference to room No. 7 the notation is, "mattresses all gone to pieces." The reference to the furniture downstairs closes with the note, "carpets all more or less worn and worthless." This invoice made by disinterested parties for the express purpose of showing the amount and condition of the property, and offered at the trial by the defendants themselves, is strong evidence that the plaintiff paid too much and was badly defrauded when she paid $1,250 for the furniture.

The record also shows that, in order to enthuse plaintiff over the prospect, the defendants now and then teleponed to her referring to this or that person, but never giving names or addresses, who had just called or telephoned with respect to renting certain portions of the house at high figures.

In further support of the plaintiff's claim that she did not receive the property she purchased, we have the testimony of certain men who were roomers of the defendants. This evidence is either in the form of direct testimony of the witnesses or in the form of a stipulation as to what

their testimony would be had they been present during the trial and testified. One of the gentlemen, a Mr. Beeman, testified that after the defendants had moved from the house the mattress left in the room of another gentleman, by the name of Mr. Nesslar, had a big hole in the center of it with a pillow stuffed therein. He also testified that the house was very short of towels and linen after the removal of the defendants, and that the roomers were compelled to purchase or borrow linen. The carpets were also badly worn and full of holes, which defects therein had been concealed by throw rugs.

The stipulation as to the testimony of the roomers Bishop and Ostrand is also very illuminating. Bishop's testimony would have been to the effect, as per stipulation, that the mattress in his room and on his bed prior to April 2, 1920, and for sometime thereafter, was a good, comfortable mattress, but that when he returned from a trip about April 15 he found, in lieu of the mattress that he had been formerly using, two dirty, old, unsanitary ticks. He refused to use the bed in that condition and he went elsewhere to sleep that night. The statement relative to the testimony of Ostrand is to the effect that draperies were removed when the defendants moved away, and that prior to their moving the equipment in room No. 1 was good.

The defendants insist most emphatically that they acted in good faith throughout the entire transaction. They are positive in their denial that the furniture and furnishings delivered to the plaintiff were not the identical ones purchased by her from them. But, as heretofore indicated, we can arrive at no other conclusion than that the plaintiff did not receive from the defendants the exact furniture that she had contracted for. The fraud of the defendants seems conclusively established.

There were other misrepresentations as to increased rents which defendants assured plaintiff the roomers were willing to pay upon a change of landladies. Defendants also misrepresented the expense of heating and lighting the

premises. They also misrepresented the value of the property. Thy told plaintiff that an experienced furniture man had examined the furniture and had declared that the property upstairs was alone worth $1,000. This was untrue.

Immediately upon discovering the situation, the plaintiff rescinded, and the defendants have accepted rescission in so far as the lease of the real estate goes. They, however, refuse to rescind with reference to the bill of sale. There is no dispute as to the value of the leasehold. In fact, it seems established that it was worth every cent that plaintiff paid for it, perhaps more. The defendants are therefore in the position of one who rescinds that portion of a transaction which is the most favorable to them. This they cannot do. The lease, bill of sale and assignment of fire insurance policies was one transaction. The defendants, having accepted rescission of a portion of it, are not permitted to refuse rescission as to the remainder.

The plaintiff has been guilty of no laches or lack of diligence in rescinding the contract after discovering the fraud, such as would estop her to demand rescission. The right to rescind on the ground of fraud must be exercised within a reasonable time after the discovery of the ground therefor. *Arnold v. Dowd*, 85 Neb. 108. What is a reasonable time depends on the peculiar circumstances of each case and is a mixed question of law and fact. *Meyer v. Fishburn*, 65 Neb. 626; 13 C. J. 616, sec. 671. It would be difficult to find a case where notification of rescission followed more promptly on the heels of the discovery of the fraud than in the instant case.

The lease and the bill of sale, together with the insurance policy and all other papers and dealings in connection therewith, are one transaction and constitute one contract, which is an entire, but not a severable, contract. The household goods were advertised for sale in the same advertisement with the offer to rent the house. Three of the plaintiff's preliminary offers were for the renting of the

house and the purchasing of the furniture. The negotiations ran along side by side. The papers were signed on the same day, at the same time, and before the same witnesses and the same notary. Items were transferred from the lease to the bill of sale, and *vice versa,* up to the last moment of the negotiations. Plaintiff regarded the whole deal as one contract. There is no dispute in the record about the value of the leasehold. If she had felt that the contract was severable, she might have held her lease, which was worth every cent of the consideration, and rescinded as to the bill of sale only, but she regarded the leasing of the premises and the purchase of the furniture as interdependent parts of the same transaction, in pursuance of her plan to operate a rooming-house. She testified specifically that she would not have taken either the lease or the bill of sale if she had not believed that the property was as represented by the parties. The lease recited that the premises were to be used as a rooming-house. That was the precise purpose for which the goods were bought. The defendants sold them to the plaintiff on that theory. Their representations to the plaintiff were based entirely on the advantages of that particular house and the particular furniture for rooming-house purposes.

"As a general rule, where two written instruments relate to the same subject-matter, one signed as a condition to the signing of the other, and both signed at about the same time, they will be construed together as constituting a single writing." *Nebraska Hardware Co. v. Humphrey Hardware Co.,* 81 Neb. 693.

"Several contemporaneous agreements between the same parties as to the same subject-matter will be construed as a whole constituting one contract." *Cutler v. Spens,* 158 N. W. 224 (191 Mich. 603):

"Where different instruments are executed at the same time, but are all parts of the one transaction, it is the duty of the court to suppose such a priority in the execution of them as shall best effect the intention of the parties. More-

over, the general rule is that, in the absence of anything
to indicate a contrary intention, instruments executed at
the same time, by the same parties, for the same purpose,
and in course of the same transaction, are, in the eye of the
law, one instrument, and will be read and construed to-
gether as if they were as much one in form as they are in
substance." 6 R. C. L. 850, sec. 240. See, also, 13 C. J.
528, sec. 487.

The defendants elected and did accept rescission of the
part of the contract favorable to themselves, and sur-
rendered and abandoned all of their rights thereunder by
their acts and conduct, after the plaintiff had rescinded
and tendered back all of the property to them. When plain-
tiff left the house, the keys were left with one of the room-
ers, who turned them over to another roomer, who in turn
took charge of the property at the request of defendants.
He continued in charge until August 1. During July,
1920, the defendants leased the property to Mrs. Fitz-
gerald for one year, and on August 1, 1920, she took pos-
session under this lease. By releasing the premises the
defendants have consented to the rescission in so far as
the lease is concerned. *Herpolsheimer v. Christopher,* 76
Neb. 352; *McKenna v. McKenna,* 118 Ill. App. 240.

The defendants, in accepting the rescission of the lease,
bound themselves to rescind the whole contract. The re-
scission of the lease was favorable to the defendants,
rather than to the plaintiff. Defendants' own witnesses
testify that the reasonable rental value of the property
was $125 a month, while the lease required plaintiff to pay
only $120 a month rent.

"A contract cannot be rescinded in part and a part re-
main executed. If rescinded at all, it must be *in toto,* and
the parties thereto placed *in statu quo* so far as the circum-
stances will permit." *Alfree Mfg. Co. v. Grape,* 59 Neb.
777. See, also, *Baker v. Thomas,* 102 Neb. 401; *Beer v.
Wisner,* 74 Neb. 437; *Collison v. Ream,* 95 Neb. 29; *Baum
Iron Co. v. Burg,* 47 Neb. 21.

Plaintiff purchased the property and leased the building for the purpose of going into the rooming-house business. On the strength of defendants' representations to her and a casual investigation, she paid $1,250 for the furniture, only to find when she took possession that it was totally unfit for the purpose for which she had bought it. Her testimony is corroborated by other witnesses and is contradicted only by the defendants themselves. As against the overpowering evidence of fraud in the record, stands only the categorical denial of these two parties.

The decree of the district court is reversed and the cause is remanded, with direction to enter a decree for the plaintiff granting her the relief prayed for in her petition.

REVERSED.